TATE, Justice.
 

 The sole question raised by this appeal in the present expropriation suit is whether the trial court erred in fixing the amount awarded to the property owner for the taking.
 

 After trial, the district court awarded the owner the sum of $30,000 for his improved city property. The plaintiff school board’s appeal seeks reduction of this award to $21,125; the defendant property owner has answered the appeal, requesting that the award be increased to $47,175.
 

 The property expropriated
 
 [1]
 
 is situated at the corner of South Rocheblave and Third Streets in New Orleans and has the dimensions of thirty feet and five inches (30'5") front on South Rocheblave Street by a depth of one hundred seventeen feet
 
 *228
 
 {117Q' along Third Street. The inside half of the one-story building located on the lot is, to a depth of
 
 68^/2
 
 feet, devoted to a 5-room residence. The remainder of the building is devoted to a bar and cocktail lounge,
 
 [2]
 
 a restaurant and kitchen,
 
 [3]
 
 a barber shop,
 
 [4]
 
 and a garage,
 
 [5]
 
 all of such premises being available for renting for commercial purposes. All witnesses testifying agreed that the improvements were in excellent condition.
 

 The measure of fair compensation for property to be awarded the owner in expropriation proceedings is ordinarily '“the market value, or the price which would be agreed upon at a voluntary sale between a willing seller and a willing purchaser, taking into consideration all available uses to which the land might be put,” State through Department of Highways v. Ragusa, 234 La. 51, 99 So.2d 20, 21, and cases therein cited. See also comprehensive Comment, “Expropriation — A Survey of Louisiana Law”, 18 La.L.Rev. 509 (1958) at 538 et seq.
 

 The market value placed upon the subject property by the expert realtors testi•fying on behalf of the school board was $21,125. They arrived at this figure by taking into consideration recent sales of, and by capitalization of the rentals of, allegedly comparable property. Because of the great discrepancy between such appraisal and the two valuations ($35,000 and $47,054 respectively) of the property by the defendant owner’s witnesses, the trial court upon its own motion appointed realtor Cliff Probst as the court’s expert to examine and evaluate the property. This latter expert, based upon both replacement cost and capitalization of rental income, arrived at a market value for the property of between $29,939 (replacement) and $30,000 (capitalization).
 
 [6]
 
 In making its award the trial court essentially accepted the latter valuation placed upon the property by this last-named expert witness.
 

 Able counsel for the school board appellant argues that the court erred in so doing and urges that instead the lower valuation by the school board’s expert realtors should have been accepted, because: (1) the school board’s appraisals
 
 *230
 
 (unlike that by the court’s expert) were based upon recent sales of comparable property, which the- jurisprudence indicates- to be the best guide to determine the market value of property sought to be expropriated, State v. Sullivan, 235 La. 314, 103 So.2d 458, Recreation and Park Commission of East Baton Rouge Parish v. Perkins, 231 La. 869, 93 So.2d 198; (2) in arriving at a market value by capitalization of income, the rental amounts and the rate of capitalization used by the school board’s realtors were allegedly better based upon comparable property and less a matter of individual opinion than were such figures utilized by the court’s expert in arriving at his higher valuation.
 

 As- to the first argument, the only recent allegedly comparable sales upon which the school board’s valuation was made were three acquisitions of, and an agreement to buy at a certain price, properties in the immediate neighborhood by the school board itself in the course of the same acquisition program for construction of a public school for which the present property is sought to be expropriated. We think the trial court did not err in accepting the opinion of the court-appointed ' expert that these could not be regarded as' comparable sales because they were not “willing seller” transactions. Aside from the obvious lack of comparability of some of the properties,
 
 [7]
 
 sales of other property to the condemning authority may be entitled to consideration but, being made under the threat of expropriation, are not controlling as comparable sales to fix market value of the property to be expropriated. State v. Sauls, 234 La. 241, 99 So.2d 97; State v. Dowling, 205 La. 1061, 18 So.2d 616. This is the general rule in many other American jurisdictions also, 4 Nichols, Eminent Domain (3rd ed. 1950) Section 12.3113(2), p. 70, the rationale being that such transactions are not the result of free bargaining between a purchaser and a vendor willing but not obliged to buy or sell, which is the test of market value. See 1 Orgel, Valuation Under Eminent Domain (2nd ed. 1953) Section 147, p. 615, cf. Section 22, p.
 
 99.
 

 [8]
 

 There being no recent comparable, sales- by which to appraise the current market value of the subject property, the trial court could properly accept the testi
 
 *232
 
 mony of the expert appointed by it, who attempted to establish market value by determining what an investor in the open market might pay for said property based upon capitalization of the net rental income to be expected therefrom, which valuation was further corroborated by a similar figure arrived at by computing the estimated reproduction cost of the improvements less depreciation plus the value of the lot itself. Efurd v. City of Shreveport, 235 La. 555, 105 So.2d 219; State v. Sauls, 234 La. 241, 99 So.2d 97; Rapides Parish School Board v. Nassif, 232 La. 218, 94 So.2d 40. This expert took into consideration the market value of the property as an economic unit suitable for business operation by one living in the connected residence, such unit fortuitously located with an exempt commercial status in a congested residential! y zoned neighborhood.
 

 Mr. Probst, the court-appointed expert, reached his capitalized value of the property as follows: From gross estimated annual rental value of $3,360,
 
 [9]
 
 estimated annual expenses of $917
 
 [10]
 
 were deducted, leaving an estimated net annual rental income of $2,343. Mr. Probst felt that a prospective buyer purchasing the property for investment would expect a net return of
 
 7\7z%
 
 upon the purchase price invested in this combined commercial-residential property; he computed the price required to bring this return at $32,500 (from which, in making its award, the court deducted the depreciated value, $2,500, of some removable fixtures located in the premises, see footnote 6 above).
 

 In estimating market value by the capitalization method, the school board’s experts estimated a gross annual rental of $2,563,
 
 [11]
 
 which gross figure was capitalized at $21,125 so as to bring a
 
 gross
 
 return of 12% per annum. Substantially, in assigning a rental value of $1 per square foot to the commercial portion of the premises herein, these experts arrived at such figure by dividing the gross annual rental of the rented premises of three allegedly comparable properties in the same neighborhood
 
 *234
 

 [12]
 
 by the square feet of the rented premises-, and averaging square-foot rental figures thus obtained. We do not believe that the trial court committed error in accepting the testimony of the court-appointed expert and of the defendant owner’s witnesses to the effect that the rental of small commercial units does not vary with the square-footage of the area rented so much as with the location of the premises ; so that, for instance, the narrower bar in the present premises might nevertheless command approximately the same rental of $125 as the wider bar on the Tanner property (Exhibit 2; Tr-31) by virtue of the former’s similar good location and its excellent state of repair.
 

 Likewise, despite the appellant’s attack upon the court’s expert’s using a capitalization rate of 7Vi
 
 %
 
 return upon the
 
 net
 
 revenues in arriving at the market value herein, we are unable to hold that the court erred in accepting the expert’s testimony that such was- the rate of return to be expected by an investor purchasing the properties, rather than the 12%
 
 gross
 
 return utilized by the school board’s experts.
 
 [13]
 
 No convincing reason is advanced why, under the circumstances and record of this case, the latter method and rate of capitalization should upon review be substituted for that accepted by the trial court.
 
 [14]
 
 There is no fixed rule as- to the rate of capitalization of rental income in arriving at market value for purposes of expropriation, capitalization being a factual matter which varies to some extent with the properties in question; although the basis for the rate used in a specific case should (as herein) be established in the record. 1 Orgel, Valuation Under Eminent Domain (1953) Section 185, p. 711; 5 Nichols, Eminent Domain (3d ed. 1950) Section 12.23, p. 221; Jahr, Eminent Domain (1950) Section 149, p. 230.
 

 Insofar as the defendant-appellee’sdemand for an increase in the award as
 
 *236
 
 serted by answer to the appeal, we may briefly state that the testimony of the expert realtor testifying on behalf of the defendant owner shows that he arrived at a much higher valuation than did all the other experts by using as allegedly of comparable nature the sale or rental of properties which are patently more valuable than the subject property. The other witness as to value testifying for defendant was not an expert realtor, and it was within the discretion of the trial court to assign far less weight to such testimony than to that of the qualified experts. Cf., Town of Slaughter v. Appleby, 235 La. 324, 103 So.2d 461.
 

 The trial court’s factual determination as to the value of the property expropriated, reached after hearing the witnesses and viewing the property and then only after educing the testimony of a court-appointed expert who was cross-examined by both parties, is entitled to great weight; and being neither manifestly excessive nor manifestly insufficient in amount will be affirmed. State v. Tramuta, 234 La. 741, 101 So.2d 450; State v. Burkes, 234 La. 659, 101 So.2d 193; State v. Sauls, 234 La. 241, 99 So.2d 97; State through Department of Highways v. Ragusa, 234 La. 51, 99 So.2d 20.
 

 For the reasons assigned, the judgment of the District Court is affirmed.
 

 [1]
 

 . It bears Municipal Nos. 2600-2602 South Rocheblave Street, New Orleans, and is designated in the conveyance records as Lot R, Square 469, of the Fourth District of New Orleans, being the square bounded by South Tonti, Third, South Rocheblave, and Fourth Streets. The lot contains 3356 sq. ft., the improvements being situated upon 2850 sq. ft. thereof.
 

 [2]
 

 . The bar and cocktail lounge opens on both Third and So. Rocheblave Sts. and has the dimensions of 12% by 62 feet or 775 sq. ft.; plus storeroom and toilets in the rear for an additional 270 sq. ft.
 

 [3]
 

 . This business premise has a front of 35 ft. on Third St.
 

 [4]
 

 . This premise has a front of 9 ft. 10 in. along Third St.
 

 [5]
 

 . The garage has a front of 9% ft. on Third St.
 

 [6]
 

 .The value of some removable fixtures was fixed at $2500 and is deducted from the gross appraisals by Mr. Probst to indicate his net valuations of the property and improvements, less such removables. In brief, defendant owner acquiesces in the ruling of the trial court that no compensation should under the circumstances herein be awarded for such items.
 

 [7]
 

 . Some being in a poor state of repair or, for instance, comprised of two stories rather than having all the rentable floor space on the ground floor,
 

 [8]
 

 . The testimony as to the front-foot value of the naked land of certain Erato St. property (Tr-44) and certain Thalia St. property (Tr — 45) not shown to be comparable except as located in “similar” neighborhoods, and a lot in Sq. 47 (Tr-170) zoned residential and not shown to be comparable except as being in the same neighborhood, concerns sales of obviously dissimilar property (insofar as the record shows), to which the trial court properly attached little weight in arriving at the market value of the subject property. Cf., Housing Authority of New Orleans v. Polmer, 231 La. 452, 91 So.2d 600.
 

 [9]
 

 . This annual rental figure was reached as follows: Residence, $720; bar, lounge, and garage, $1,500 ($125 per month); barber shop, $570; restaurant, $570. (Because the bar is operated by the resident owner and his brother and the other business premises are rented as drawing cards to enhance the owner’s business profits, it is not contested by any of the experts that the actual rentals charged in this essentially intrafamily operation do not reflect the open market rental value of the property.)
 

 [10]
 

 . Taxes, repairs and painting, insurance, and depreciation.
 

 [11]
 

 . Computed as follows: residence, $720; barber shop, $360 (present rent paid by long-time tenant); bar, $1045; and restaurant, $438, based upon estimated annual rental at $1.00 per square foot for commercial property in neighborhood. It is to be noted that this gross rental does not include the rental value of the garage (233 sq. ft.).
 

 [12]
 

 . These properties were: The Tanner property (Exhibits 2, 2a, 3, 3a, 4; Tr-28 et seq); the Evans property (Exhibits 7, 7a, 8); and the Meyer property (Exhibits 9, 10).
 

 [13]
 

 . The result mathematically of using a higher rate of return in capitalizing income is to produce a lower capital investment (i. e., market value), since less of a purchase price thus invested is required at a- higher rate of interest to produce the same income.
 

 [14]
 

 . ' As noted above in the opinion, the purchase price of property in purchases made under the threat of expropriation by the condemning authority cannot be regarded as a reliable guide to the market price in a willing seller transaction. For this reason, the evidence that the annual rate of the Tanner and Evans properties was 15% and 16% of the price paid for such properties by the school board could properly be regarded by the trial court not as indicating abnormally high rates of rental return upon capital value, but rather as an indication of depressed sales prices of property sold under threat of expropriation.